UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**24-20083-CR-ALTONAGA/REID**

Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 982(a)(7)

FILED BY ____MP____ D.C.

Mar 12, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES OF AMERICA

vs.

NIKITA S. HERMESMAN,

      **Defendant.**

_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

### Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

3.      Medicare was subdivided into multiple program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" covered physicians services and outpatient care, including laboratory testing. Medicare Part C, also known as the "Medicare Advantage" Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans, including health maintenance organizations and preferred provider organizations.

4.      Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.      A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically via interstate wire.

6.      When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the items and services that were purportedly provided, as set forth in the claims, were medically necessary.

7.      Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

### Part B Coverage and Regulations

8.      CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

9.      Novitas Solutions Inc. was the MAC for consolidated Medicare jurisdictions that included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. Palmetto GBA was the MAC for consolidated Medicare jurisdictions that included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia.

10.     Payments under Medicare Part B were often made directly to the provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the provider. Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Genetic Tests

11.     Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future. For example, cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

Pharmacogenetic ("PGx") testing used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications. CGx and PGx are referred to herein collectively as "genetic testing."

12. Medicare did not cover laboratory testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

13. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. 42 C.F.R. § 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

### The Defendant, Related Entities and Relevant Persons

14. HCC Management Group LLC ("HCC") was a limited liability company formed under the laws of Florida and whose principal place of business was located in Aventura, Florida.

15. Hermesman HCMG LLC ("HCMG") was a limited liability company formed under

4

the laws of Florida and whose principal place of business was located in Aventura, Florida.

16. Defendant **NIKITA S. HERMESMAN** was a resident of San Antonio, Texas. **HERMESMAN** was the owner, manager, and operator of HCC and HCMG.

17. Palm Sales LLC ("Palm") was a limited liability company formed under the laws of Florida and whose principal place of business was located in Delray Beach, Florida.

18. Michael Lewin was a resident of Delray Beach, Florida, and was the owner, manager, and operator of Palm.

19. Jason Santini was a resident of Delray Beach, Florida.

20. Steven Burack was a resident of Boca Raton, Florida.

21. Clio Laboratories, LLC ("Clio") was a limited liability company formed under the laws of Florida and later Georgia, and whose principal place of business was located in Lawrenceville, Georgia. Clio purported to serve as a diagnostic testing laboratory.

22. Performance Laboratories, LLC ("Performance") was a limited liability company formed under the laws of Oklahoma and whose principal place of business was located in Oklahoma City, Oklahoma. Performance purported to serve as a diagnostic testing laboratory.

23. Alpha Medical Consulting Inc. ("Alpha") was a corporation incorporated under the laws of Georgia and whose principal place of business was located in Lawrenceville, Georgia.

24. Khalid Satary was a resident of Lawrenceville, Georgia, and controlled Clio, Performance, and Alpha.

25. Company 1 was a limited liability company formed under the laws of Florida and whose principal place of business was located in North Miami Beach, Florida.

26. Co-Conspirator 1 was a resident of North Miami Beach, Florida, and was an owner, manager, and operator of Company 1.

## Conspiracy to Commit Health Care Fraud
## (18 U.S.C. § 1349)

1. The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around November 2017, and continuing through in or around June 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**NIKITA S. HERMESMAN,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Khalid Satary, Michael Lewin, Jason Santini, Steven Burack, Co-Conspirator 1, and others known and unknown to the United States Attorney, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

3. It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries, so that laboratories, including Clio and Performance, could bill Medicare for genetic tests, without regard to whether the beneficiaries needed the tests; (b) paying kickbacks and bribes to doctors, including Steven Burack, in exchange for ordering and arranging for the ordering of genetic tests for Medicare beneficiaries, without

6

regard to whether the beneficiaries needed the tests; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare for genetic tests that were medically unnecessary, ineligible for reimbursement, and procured through the payment of kickbacks and bribes; (d) concealing the submission of false and fraudulent claims to Medicare and the payment and receipt of illegal kickbacks and bribes; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4. **NIKITA S. HERMESMAN** engaged Michael Lewin, Jason Santini, Co-Conspirator 1, and other co-conspirators to recruit Medicare beneficiaries to accept genetic tests, regardless of medical necessity, and to find doctors to sign laboratory requisition forms – also known as "prescriptions" – for genetic tests. These prescriptions were medically unnecessary and ineligible for reimbursement as the doctors did not meet with or examine the beneficiaries, were not treating the beneficiaries for cancer or symptoms of cancer or other diseases, and did not use the test results in the beneficiaries' treatment.

5. **NIKITA S. HERMESMAN** agreed with Michael Lewin, Jason Santini, Co-Conspirator 1, and other co-conspirators to provide the doctors, including Steven Burack, with pre-filled prescriptions that pre-selected which genes the doctors would order to be tested for the beneficiaries based on how much Medicare reimbursed for the tests, not because of medical necessity.

6. Michael Lewin, Jason Santini, Co-Conspirator 1, and other co-conspirators offered and paid illegal kickbacks and bribes to doctors, including Steven Burack, to sign the prescriptions for genetic tests.

7. **NIKITA S. HERMESMAN** and other co-conspirators, through HCC and HCMG, offered and paid illegal kickbacks and bribes to Michael Lewin and Jason Santini, through Palm, and to Co-Conspirator 1, through Company 1, in exchange for providing the genetic testing samples and Medicare-required documents they obtained, including signed prescriptions for the genetic tests (collectively referred to as "doctors' orders").

8. **NIKITA S. HERMESMAN**, through HCC and HCMG, solicited and received illegal kickbacks and bribes from Khalid Satary, through Clio, Performance, and Alpha, and other co-conspirators in exchange for referring beneficiaries and doctors' orders for genetic testing that **HERMESMAN** obtained from Michael Lewin, Jason Santini, and Co-Conspirator 1.

9. **NIKITA S. HERMESMAN** and other co-conspirators concealed and disguised the scheme by creating sham invoices and documents, including those that disguised the kickbacks and bribes as payments for purported, legitimate marketing services.

10. **NIKITA S. HERMESMAN**, Khalid Satary, Michael Lewin, Jason Santini, Steven Burack, Co-Conspirator 1, and other co-conspirators caused laboratories, including Clio and Performance, to submit false and fraudulent claims for the genetic tests to Medicare in the approximate amount of $23,867,265.

11. As the result of these false and fraudulent claims, Medicare made payments to laboratories, including to Clio and Performance, in the approximate amount of $7,728,257.

12. **NIKITA S. HERMESMAN** solicited and received, through his companies HCC and HCMG, approximately $2,389,140 in kickbacks and bribes in exchange for referring beneficiaries and doctor's orders for genetic tests.

13. **NIKITA S. HERMESMAN**, Khalid Satary, Michael Lewin, Jason Santini, Co-Conspirator 1, and other co-conspirators used the fraud proceeds to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

1. The allegations of this Information are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **NIKITA S. HERMESMAN**, has an interest.

2. Upon conviction of a violation of 18 U.S.C. § 1349, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

3. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21 U.S.C. § 853(p).

All pursuant to 18 U.S.C. § 982(a)(7), and the procedures set forth in 21 U.S.C. § 853, as incorporated by 18 U.S.C. § 982(b)(1).

_____
MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
REGINALD CUYLER JR.
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: 24-20083-CR-ALTONAGA/REID

v.

NIKITA S. HERMESMAN,

_____/
Defendant.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☒ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.
3. Interpreter: (Yes or No) No
   List language and/or dialect: _____
4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:
   (Check only one)                  (Check only one)
   I    ☒ 0 to 5 days               ☐ Petty
   II   ☐ 6 to 10 days              ☐ Minor
   III  ☐ 11 to 20 days             ☐ Misdemeanor
   IV   ☐ 21 to 60 days             ☒ Felony
   V    ☐ 61 days and over
6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) Yes
   If yes, Magistrate Case No. 23-mj-08328
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge Singhal   Case No. 23-CR-80109
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No
15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: ___/s/_____
REGINALD CUYLER, JR.
DOJ Trial Attorney
FL Bar No.   0114062

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**PENALTY SHEET**

**Defendant's Name:** _____**NIKITA S. HERMESMAN**_____

**Case No:** _____

Count #: 1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud
* **Max. Term of Imprisonment:   10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) Case No. |
|  | ) **24-20083-CR-ALTONAGA/REID** |
| Nikita S. Hermesman, | ) |
| *Defendant* | ) |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*